## MILO G. KELLOGG

*v.*

## WESTERN ELECTRIC MANUFACTURING COMPANY *et al.*

*Opinion filed November 1, 1897.*

1. TRUSTS—*sale of patent—what not sufficient to create a trust relation.* Mere lapse of time and failure by the purchaser of a patent to pay for the same, coupled with the difficulty of ascertaining the value of the patent when sold, will not convert the relation of buyer and seller into one of trustee and *cestui que trust.*

2. EQUITY—*when bill for accounting cannot be maintained.* In the absence of fraud or an excuse for the delay a bill for an accounting by the assignor of a patent against the assignee cannot be maintained in equity, where it appears from the bill that the assignment was merely a sale, and the assignor's remedy at law to recover compensation is barred by the Statute of Limitations.

*Kellogg v. Western Electric Manf. Co.* 67 Ill. App. 53, affirmed.

APPEAL from the Appellate Court for the First District;—heard in that court on appeal from the Circuit Court of Cook county; the Hon. ELBRIDGE HANECY, Judge, presiding.

This cause comes to this court by appeal from the Appellate Court for the First District, wherein a decree of the Superior Court of Cook county sustaining appellees' demurrer to appellant's bill of complaint and dismissing the bill for want of equity was affirmed.

The substance of the bill, so far as necessary to be stated, is, that in 1879 the complainant was an officer and employee of the Western Electric Manufacturing Company, and that afterwards, in 1882, the other appellee company, the Western Electric Company, became the successor in business to the first named company, and succeeded to and assumed all of its liabilities; that the said companies were engaged in the manufacture and sale of electrical appliances, especially such as were connected with telegraphy and telephony; that complainant was a

large stockholder in said companies; that his duty to said companies did not, either by virtue of his employment or otherwise, entitle them to any product of or advantage from his inventive skill or talent; that while he was so employed, in October, 1879, he invented, among other things, an improvement in multiple switch-boards for telephone exchanges, for which letters patent were afterward, in November, 1884, issued in his name, as assignor, by *mesne·* assignments to said Western Electric Company; that he had, prior to April, 1881, five applications for patents pertaining to his improvements in telephony pending in the United States patent office, and that his solicitor in said applications employed by him was the attorney, also, of said company, and that in April, 1881, said attorney prepared an assignment of said applications to the Western Electric Manufacturing Company, which he signed and gave back to said attorney, "expecting" (proceeding in the language of the bill) "to receive reasonable compensation for said patents from said company, and executing and delivering the same relying upon that understanding that had been induced from the fact that the executive officers and representatives of the majority of the stock of said company had determined upon the policy of obtaining control of all telephone patents within their ability or power, in order that they might build up a large and successful business for said company, and to that end had theretofore instructed your orator, as superintendent, to pursue that policy and purchase all such patents which, in the opinion of the managing officers of said company, would probably prove advantageous to that end. Your orator, therefore, when the said attorney asked him to assign said pending applications, did so, fully understanding and believing that he would be adequately compensated for the same,—all of which said company and its managing officers well knew, and accepted said transfer with that understanding; that soon after the making of said assignment your orator stated

to Gen. Anson Stager, the then president of the Western
Electric Manufacturing Company, that he expected to be
allowed reasonable compensation on account of the as-
signments of his applications, (including said multiple
switch-board application,) but your orator and said officer
failed to come to any agreement as to the amount of such
compensation; that the invention included in said mul-
tiple switch-board application was by far the most im-
portant and valuable of the five applications, but that
the value of the invention was then uncertain, the claims
of the application being then, or immediately and for a
long time afterwards, involved in much confusion and
doubt; that said Barton also, during the same period, was
engaged in prosecuting an application for one Scribner
for a like invention, in which proceedings, as will ap-
pear from the record of the patent office, the substantial
invention of your orator was, either because said Barton
believed that said invention was in reality the invention
of Scribner and not of your orator, or because Scribner's
invention had been bought by said company and your
orator's invention had not been bought, or through mis-
take or inadvertence of said attorney, but without your
orator's knowledge or consent, disclaimed as the inven-
tion of your orator and inserted among the claims of said
Scribner, upon learning which your orator interfered and
demanded that such disclaimer should be withdrawn,
which was done, and upon subsequent adjudication with
said Scribner, who was then the paid inventor of said
company, having a contract with him by which it was
entitled to all inventions by him made, your orator was
awarded priority and given a patent embracing the very
matter so disclaimed.   Your orator further shows to the
court that he was at this same period a large stockholder
in said company, and believing that the use of said pat-
ents by said company would be advantageous to said com-
pany and to him, both as a stockholder and owner, did
not press the sale thereof while such diverse views ex-

isted respecting its value, but allowed said assignment to stand, with such legal or equitable rights to the company and to himself as might result therefrom,—all of which the officers and agents of said company well knew, and by their conduct at least assented thereto; that in pursuance of such design the said claim for a patent was prosecuted through the patent office, said company and its successor hereinafter named contributing and paying the attorney's fees and costs thereof, and your orator contributing much time and effort, exceeding many times the value of the expenditures made by the defendants, all of which resulted in the favorable action of the patent office and the issuance of the patent, as hereinbefore set forth."

The bill alleges that it was not within the contemplation of complainant or of the officers of the company that by such assignment any gift was made or intended to be made of said invention to the company. It alleges also that the Western Electric Company did not purchase the business and property of its predecessor, the other appellee, but that the assets and property of the latter and other companies and persons mentioned, together with a license to manufacture telephone appliances under patent rights owned by the American Bell Telephone Company, were by mutual agreement consolidated and merged in said Western Electric Company, each constituent member taking stock in such new company and the latter assuming all of the debts and liabilities of said Western Electric Manufacturing Company. It is also alleged that when complainant assigned his invention to the company it was a rival and competitor of the American Bell Telephone Company and of other companies, and that he could have obtained reasonable compensation from some of those companies for such invention had not the defendant company promised to give him reasonable compensation for the same and acquiesced in his demand for such compensation, but that in 1884, when the patent was awarded,

all these rival and conflicting interests had been merged in the Bell company, which company had then obtained a monopoly in the art of telephony, and it, or its related or subordinated companies, became the only possible purchaser or purchasers of his invention; that by virtue of such consolidations the Western Electric Company, successor to the other appellee, became the manufacturer of telephone instruments and appliances for the Bell company, and the complainant being a large stockholder in said Western Electric Company, and it being impossible to determine the value of said invention in the then condition of the art of telephony, deemed it would be best for him to rely upon the understanding that he should receive reasonable compensation for his patent and allow time to determine what that would be; that the defendants now refuse to recognize complainant's interests and seek to deny him all compensation for his invention and the assignment thereof; that by reason of the facts the Western Electric Manufacturing Company, and its successor, held and now hold title to said patent in trust for the complainant, and are liable to account to him for all profits derived therefrom after deducting all just and proper expenses; that about October 23, 1891, he withdrew his offer of sale, and then, and many times since said last named date, requested defendants to so account to him for such profits, but that such requests have been refused on the ground that his rights to said patent have been lost by *laches* and barred by the Statute of Limitations; that his interests in said patent were never repudiated or denied by the defendants until about December 15, 1891. It is then alleged that said multiple switch-board is used in connection with other patents, and that such an accounting can be had only by obtaining the opinions of experts, and because of its complexity can only be had in a court of equity, and that if properly taken complainant will be entitled to recover many hundred thousands of dollars.

The bill prays that said Western Electric Company be decreed to hold the patent in trust for complainant, that he is the equitable owner thereof, and that said company come to an accounting and pay to him the amount found due, and for general relief.

CHARLES H. ALDRICH, for appellant.

WILLIAMS, HOLT & WHEELER, for appellees.

Mr. JUSTICE CARTER delivered the opinion of the court:

As stated by counsel for appellant, the purpose of the bill of complaint in this case "is to hold the defendants (appellees) as trustees, and liable to account as such for the profits of certain patent property invented and formerly owned by the complainant, and conveyed, as it is alleged, under such circumstances as to make the defendants liable to an accounting."

If the facts stated in the bill, and, so far as they are well pleaded, admitted by the demurrer, show that the Western Electric Manufacturing Company took the legal title to the patented invention in controversy in trust for the benefit of the complainant, then the court erred in sustaining the demurrer, unless it appears by the bill that when it was filed appellant's rights were barred by *laches.* The terms of the assignment are nowhere set out in the bill, and it is not claimed there was any express trust. Neither is it alleged that the company obtained said assignment of appellant's invention by fraud, artifice or deceit. The circumstances alleged in the bill relating to the unauthorized withdrawal by the attorney of appellant's claim to the invention and the insertion of it in Scribner's application, occurred after the assignment was executed and delivered, and it is not pretended that appellant was in any manner induced by appellees to make the assignment. It is alleged in the bill that the attorney, who was the attorney of both parties, prepared the

assignment and that appellant signed it and gave it back to the company, expecting to receive reasonable compensation for said patents from the company for the same,— that is to say, he expected and understood that he was selling his invention to the company for its reasonable value, and not that he was placing the legal title thereto in the company in trust for him. It is further alleged that his understanding in this respect was induced from the fact that the company had determined upon the policy of obtaining control of all telephone patents within its power, in order to build up a large and successful business, and had instructed him to purchase all such patents which, in the opinion of the managing officers, would probably prove advantageous to that end. It thus appears that appellant knew the company's policy was to purchase such inventions,—not to take them in trust for the inventors and account for the profits; and it was this knowledge, rather than any promise of the company, which it is alleged induced in him the expectation or understanding that he would receive reasonable compensation for the said property. The most that can be said, in view of the allegations of the bill, is, that the company became the purchaser of the invention under an implied promise to pay appellant therefor whatever its reasonable value then was. There was nothing in his relations to the company which would have prevented him from selling the invention to it by express contract, fairly made, for what it was reasonably worth, and from the circumstances of the transfer we are unable to see that anything more than such a sale can be implied. If appellant's right to recover in an action of assumpsit is barred by the Statute of Limitations, it is, so far as appears by the bill, his own fault. The company simply did nothing but accept the transfer and make use of the invention, without making any recompense. It may well be that a gift was not intended or contemplated by either party,— indeed, it is so alleged in the bill; but a trust enforcible

in equity cannot be implied simply because the company neglected to make payment for what it had purchased, until, by the inaction of both the buyer and seller, the right to recover the purchase price has become barred at law. It does not alter the case that neither party had, at the time of the transfer, any adequate conception of the great value of the invention or what its development and future use would prove its value to be. There is nothing in the bill which amounts to an allegation that there was any agreement, express or implied, between appellant and the company that appellant should wait until the usefulness and value of his invention in the art of telephony could be more adequately determined, and that he would be compensated out of the profits which should be received by the company from its use. Such matters might well have been embraced in a contract, but were not. It may be, as alleged in the bill, that appellant "deemed that it would be best for him to rely upon the understanding that he should receive reasonable compensation for his patent, and allow time to determine what such reasonable compensation should be," but he could not, by resting upon the mere silence of the company and by waiting until his right to recover at law had been barred by the statute, create a trust relation between himself and the company, and recover vast sums or profits derived by the company from the use of the invention in lieu of what its value was when the sale was made. Had he, in carrying out the policy adopted by the company, bought for it such an invention from a third person, upon a promise, express or implied, to pay a reasonable compensation therefor, mere lapse of time and non-payment, coupled with the difficulty of ascertaining at the time of the sale such reasonable compensation because of the infancy of the art of telephoning, would not, in the absence of other circumstances giving rise to equitable rights, convert the relation of buyer and seller into one of trustee and *cestui que trust*,—and it is not easy to see how he

stood in any better position in this respect as a seller than a third person would have occupied. The company owed no duty to him except to pay him, and there is therefore no ground upon which to base a constructive trust. He was charged with a duty to the company to purchase for it such inventions, and had he purchased them and taken title to himself he might well have been charged as trustee holding for the company; but the converse of this would not be true, for the company owed no duty to him in such a matter other than to pay as a purchaser.

The bill alleges that the assignment was made in 1881, under circumstances which we hold amounted to a sale for a reasonable price, and it then alleges that in 1891 appellant "withdrew his offer of sale." The bill does not allege that there had been any offer of sale to the company, nor any sale upon condition, giving appellant, after the lapse of ten years and after the discovery that the invention was of immense value, the right to withdraw such offer or to rescind the sale and recover his property, and the profits derived from its use, because of the failure to perform the condition. Nor does the bill ask for a re-assignment of the patented invention, but seeks only to hold the appellees as his trustees, after they or their licensees have, in connection with other appliances in the art of telephony and in the prosecution of their great enterprise, for more than a decade created for the invention an earning power of large value, and accountable to him for the profits arising from its use. To so decree would, under the allegations of the bill, be inequitable, however inequitable it may seem for appellees to refuse to pay appellant reasonable compensation for the valuable property which they obtained from him.

The judgment of the Appellate Court is affirmed.

*Judgment affirmed.*